UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

TERRY W. EMMERT,

                Plaintiff,

     v.

STEWART TITLE GUARANTY
COMPANY, a Texas corporation,

                Defendant.

_____

STEWART TITLE GUARANTY
COMPANY, a Texas corporation,

                Third-Party Plaintiff
     v.

PACIFIC NORTHWEST TITLE OF
OREGON, INC., an Oregon corporation,

                Third-Party Defendant.

Case No. 3:11-cv-00003-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

       Plaintiff, Terry W. Emmert ("Emmert"), initially filed this action in the Clackamas

County Circuit Court in the State of Oregon against Stewart Title Guaranty Company ("Stewart

Title"), a Texas corporation, alleging claims for breach of contract and unjust enrichment.

Notice of Removal (docket # 1), Exs. A & B.  Stewart Title timely removed that action to this

court under 28 USC § 1441 based on diversity of citizenship under 28 USC § 1332.

Stewart Title then filed an Answer and Third Party Complaint against Pacific Northwest

Title of Oregon ("PNWT") alleging two indemnity claims (docket # 22) to which PNWT filed an

Answer (docket # 54).

Stewart Title has now filed an Amended Motion for Summary Judgment (docket # 50)

against Emmert on all claims which PNWT has joined (docket # 56).  For the reasons set forth

below, Stewart Title's motion should be granted.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to a judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only determine[] whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047,

1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely

colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*,

493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).  The court

must view the inferences drawn from the facts "in the light most favorable to the nonmoving

party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## FACTS

A review of the parties' submissions[1] reveals the following facts viewed in the light most favorable to Emmert, the non-movant.

## I.      The 1996 Purchase by Emmert

On January 18, 1996, Emmert executed a purchase and sale agreement to buy a piece of commercial property ("Property") in Clackamas County, Oregon, from Carl Kelly, Jim Hartman and Ron Miner ("Sellers").  Stewart Title served as the escrow and title company for the transaction.[2]

On January 29, 1996, Stewart Title provided the parties with a Preliminary Title Report. Scott Decl., Ex. 1.  On March 7, 1996, Stewart Title identified an access issue because it "was unable to find a grant of easement for our property . . . in order to gain access to and from 74th Avenue which connects with Johnson Creek Blvd."  *Id.*, Ex. 3.  Several days later, Stewart Title escrow officer Prue Ellis ("Ellis") inquired whether two documents, a 1973 "deed showing a public easement [across]Lots 1, 4 and 5 Johnson Creek 76th Industrial Park" and a draft of 1978 By-Laws of Johnson Creek – 76th Industrial Park Land Owners Association ("Land Owners Association"), would give Emmert access to the property.  *Id.*, Ex. 4

On March 27, 1996, the Sellers' counsel, C. David Hall ("Hall"), responded to Stewart Title that "[t]he documents provide that a landowner acquires rights in the Land Owners

---

[1] The parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

[2] At the time, PNWT operated as Stewart Title of Oregon, Inc.

3 - FINDINGS AND RECOMMENDATION

Association on both voting and use rights.  As such[,] an owner within the Land Owners

Association acquires the right to use the easement held by the Land Owners Association . . . .

Upon the purchase it would seem to me that Emmert would acquire the voting interest in the

76th Land Owners Industrial Park Land Owners Association and the right to use the easement."

*Id*, Ex. 5.

On April 25, 1996, Jeff Howell ("Howell"), a Stewart Title search and examination

employee, responded to Ellis as follows:

> Concerning questions about easement for the property described in
> 96111260-C (Hartman/Emmert)[,] I have enclosed a map showing access
> from Johnson Creek Blvd., North over Tax Lots 801 and 601 to the south
> line of Johnson Creek – 76th Industrial Park and then Northwesterly over
> Lots 1, 4 and 5 said subdivision to the center of Johnson Creek.  As far as
> I can tell all of this property is vested in the Johnson Creek 76th Industrial
> Park Land Owners Association and according to their Bylaws, they have
> the authority to grant this easement (or the right to its use) to anybody.
> Hope this helps.  Haven't prepared supplemental report yet.  Awaiting
> your reply.

*Id*, Ex. 6.

On September 12, 1996, Hall wrote to Ellis as follows:

> [Y]ou had some questions as to whether or not Mr. Hartman, Mr. Kelly
> and Mr. Miner were members of the Johnson Creek – 76th Industrial Park
> Land Owners Association.  I would direct your attention to the By-laws of
> the Johnson Creek – 76th Industrial Park Land Owners Association.
> Article III, Section 1 provides as follows:
>
> > "Each person or entity who is an individual site owner,
> > including contract sellers, of an undivided interest in the
> > industrial site, located upon any part of the Johnson Creek
> > 76th Industrial Park, shall by virtue of such ownership be a
> > member of the association."
>
> It appears from Article III, Section 1, that the property ownership bestows
> upon Mr. Hartman, Mr. Kelly and Mr. Miner, absolute membership in the
> Johnson Creek – 76th Industrial Park Land Ownership Association.

*Id*, Ex. 7.

4 - FINDINGS AND RECOMMENDATION

By letter dated September 12, 1996, Rosa Stombaugh ("Stombaugh"), a Stewart Title Officer, advised Hall that "[t]he letter which was requested will not be forthcoming.  Carol Carmichael, Legal Counsel advised that the only written statement of our position on the issues of title that I can make is in the form of the Preliminary Title Commitment."  *Id*, Ex. 8.  A few days later on September 16, 1996, Stewart Title provided the parties with a Second Revised Preliminary Title Report adding Parcel IV which described an easement for ingress and egress to the Property with two special exceptions to coverage:  # 14 for the "Rights, duties, obligations and maintenance assessments in connection with Johnson Creek-76th Industrial Park Land Owners Association and the use of the access road shown herein as Parcel IV" and # 15 for the "Rights of others in connection with the use of access road shown herein as Parcel IV."  *Id*, Ex. 9, pp. 3, 6.  That Parcel IV easement is shown on the attached map as crossing lots 700, 801, 601, 603 and a portion of 3601 in the Johnson Creek-Industrial Park to the center of Johnson Creek.  *Id,* p. 8. On September 18, 1996, PNWT issued a Third Revised Preliminary Title Report describing the same easement and listing the same special exceptions (now numbered as # 17 and # 18).  *Id*, Ex. 10.

In connection with the warranty deed executed on September 19, 1996, by the Sellers to Emmert (*id*, Ex. 11), Stewart Title issued a Title Policy to Emmert based on the Third Revised Preliminary Title Report which includes the following provisions:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, STEWART TITLE GUARANTY COMPANY, a Texas corporation, herein called the Company, insures, as of Date of Policy Shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:
> 1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
> 2.  Any defect in or lien or encumbrances on the title;

3.  Unmarketability of the title;
4.  Lack of a right of access to and from the land.

* * *

### SCHEDULE A

* * *

1.      Name of Insured: Terry W. Emmert
2.      The estate or interest in the Land that is insured by this Policy is:
Fee Simple as to Parcels, I, II, III, V, VI and VII
Easement as to Parcel IV
3.      Title to the estate or interest in the Land is vested in:  Terry W. Emmert
4.      The Land referred to in this policy is described as follows:
**SEE EXHIBIT "A"**

### SCHEDULE B

* * *

**This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of:**

* * *

16.      Rights, duties, obligations and maintenance assessments in connection with Johnson Creek-76[th] Industrial Park Land Owners Association and the use of the access road shown herein as Parcel IV.
17.      Rights of others in connection with use of the access road shown herein as Parcel IV.

*Id,* Ex. 12.

## II.      <u>The 2009 Transaction</u>

On July 29, 2008, Emmert agreed to sell the Property to Metro, the elected regional government for the Portland metropolitan area, for $1.5 million, "a price that is less than its fair market value" with the intent "that the resulting partial donation be a gift to Metro for exclusively public purposes, and give rise to a tax deductible charitable contribution."  Scott Decl., Ex. 13.

As the escrow and title company, PNWT[3] issued a Preliminary Title Report, on August 1, 2008, for the Property, together with an easement for ingress and egress which is the same as the

---

[3] At this time, Stewart Title was no longer serving as an underwriter for PWNT, and PNWT no longer conducted title business as Stewart Title's agent.

Parcel IV easement in the 1996 Title Policy. *Id,* Ex. 14, p. 5. It also contained the same special

exception to coverage as in the 1996 Title Policy for the "Rights, duties, obligations and

maintenance assessments with Johnson Creek-76th Industrial Park Land Owners' Association as

disclosed by Deed recorded September 24, 2006, Recording No. 96-070885. (Appears to affect

the easement rights insured herein)." *Id*, Ex. 14, p. 3 (exception # 14). On August 7, 2008,

PNWT issued a Supplemental Preliminary Title Report containing the identical easement and

special exception. *Id*, Ex. 15.

> On August 22, 2008, Metro's counsel wrote a letter to Emmert stating:
>
>> We are reviewing title currently and working with the title company to
>> document the property's access easement right over property in the
>> Johnson Creek 76th Industrial Park. The vesting deed of your predecessor
>> in interest does not include an easement with the same description (see
>> deed from Bader to Carl Kelly, James Hartman and Ronald Miner
>> recorded on 7/17/1981 as Fee No. 81-25139). By copy of this letter to
>> Pacific Northwest Title Co., we are requesting that the title company
>> provide us with more information or explanation to document the origin of
>> the access easement described in your vesting deed.

*Id*, Ex. 16, p.1.

By letter dated September 5, 2008, Metro's counsel advised Emmert that Metro would

not accept special exception # 14 in the Supplemental Preliminary Title Report "unless an access

easement appurtenant to the Property is granted by the Johnson Creek 76th Industrial Landowners

Association." *Id*, Ex. 17. To facilitate closing of the transaction, Stewart Title then worked with

adjoining property owners to resolve the easement situation. *Id*, Exs. 17-19.

On June 29, 2009, Emmert agreed to "obtain a valid access easement, in a form

acceptable to Metro, from adjoining property owners in order to support the purchase price for

the Property and thereby satisfy the condition precedent for closing set forth in Section 6.1.4 of

7 - FINDINGS AND RECOMMENDATION

the Agreement." *Id*, Ex. 20.[4]  Emmert paid $54,000 to obtain an easement in a form acceptable

to Metro, and the 2009 Transaction closed in August 2009.  *Id*, Ex. 21.  This easement is in a

different location than the one insured by Stewart Title as Parcel IV in the 1996 Title Policy and

instead crosses lots 700, 801, 601, 3603, 3602, 3605 and 3607.  *Id*, Ex. 20, p. 24.

     Emmert alleges that he would not have purchased the Property without a title insurance

policy insuring him "that there [were] no issues or concerns regarding access, easements or

rights of way."  Amended Complaint, ¶ 12.  He claims that due to Stewart Title's failure to honor

the terms of the 1996 Title Policy, the value of the Property was diminished, causing him to

suffer a loss on the sale of the Property in the sum of $1,065,000 ($2,200,000 to $1,135,000) plus

the amount he paid for an easement in the sum of $54,000.  *Id*, ¶¶ 13-14.

## FINDINGS

     Emmert's breach of contract and unjust enrichment claims allege that Stewart Title has

failed to honor the terms of the Title Policy by refusing to pay for the loss on the Property caused

by the problem with the easement.  Stewart Title argues that it is entitled to summary judgment

because Emmert has suffered no loss from the lack of a legal access easement and, in any event,

the alleged loss is excepted from coverage under the 1996 Title Policy.

## I.    Interpretation of Title Policies

     A title policy is interpreted according to the rules applicable to insurance contracts.  *De

Carli v. O'Brien*, 150 Or 35, 51, 41 P2d 411, 417 (1935).  "As a general rule, the construction of

a contract is a question of law."  *May v. Chicago Ins. Co.*, 260 Or 285, 292, 490 P2d 150, 153

(1971).  The objective in construing a contract of insurance is to determine the intent of the

parties.  *Hoffman Constr. Co. v. Fred S. James Co.*, 313 Or 464, 469, 836 P2d 703, 706 (1992).

---

[4] The purchase price was reduced from $1.5 to $1.366 million based on a market value appraisal which expressly
assumed that access could be obtained.

The court uses a three-step process to determine the intent of the parties.  *Andres v. American Standard Ins. Co. of Wis.*, 205 Or App 419, 423-24 134 P3d 1061, 1063 (2006).  The first step is to examine the text of the policy and determine whether it is ambiguous, in that the court considers whether it is susceptible to more than one plausible interpretation.  If the policy is not ambiguous, it is interpreted in accordance with that unambiguous meaning.  *Hoffman Constr. Co.*, 313 Or at 469–70, 836 P2d at 706.  The text is construed in accordance with any definitions of disputed terms included in the policy.  *See, e.g.*, *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 101, 585 P2d 657, 660 (1978) ("The insurance company may, of course, insert in its policy any definition of [policy terms] it chooses[.]" ).  If the policy does not define the terms in dispute, the court then considers the "ordinary meaning" and other aids to construction.  *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307–08, 985 P2d 1284, 1287 (1999) (court turns to aids to construction only if the policy does not define critical terms).

If the text of the policy is ambiguous, the second step is to examine the disputed terms in the broader context of the policy as a whole.  *Hoffman Constr. Co.*, 313 Or at 470, 836 P2d at 707.  If the ambiguity remains, then the court construes the policy against the drafter.  *Id* at 470–71, 836 P2d at 707; *see also Andres*, 205 Or App 419, 134 P3d 1061; *In re Helicopter Crash Near Weaverville, Ca. 8/5/08,* 714 F Supp 2d 1098, 1108 (D Or 2010).

II.     <u>**Lack of Legal Right to Access**</u>

Emmert claims that the Property suffered a lack of a legal right to access as insured under the 1996 Title Policy.  He testified in his deposition that he did not physically access the Property using the Parcel IV easement described in the 1996 Title Policy because there was no bridge across Johnson Creek from the end of that easement to the Property.  Snee Decl., Ex. 5 (Emmert Depo., p. 40).  Instead, he physically accessed the Property using a different route.  Scott Depo.,

Ex. 22 (Emmert Depo., p. 36).  At oral argument, Emmert's counsel clarified that this other route

is the easement ultimately purchased by Emmert for the benefit of Metro.  Scott Decl., Ex. 20, p.

24.  The first part of the new easement is in the same location as the Parcel IV easement across

lots 700, 801 and 601, but instead of continuing straight to Johnson Creek, it veers off to the east

and north across lots 3603, 3602, and 3607 to Johnson Creek.

      However, what route Emmert actually used to access the Property is irrelevant to his

claims.  To blame his loss on Stewart Title, he must prove that the Parcel IV easement insured by

the 1996 Title Policy is not a legal easement.  This he has not done.

      Prior to purchasing the property in 1996, Stewart Title investigated whether the Land

Owners Association had the authority to grant the easement.  It located a 1973 deed granting an

easement, as well as the 1978 draft of the By-Laws of the Johnson Creek – 76th Industrial Park

Land Owners Association.  Scott Decl., Ex. 4.  According to the By-laws, "[e]ach person or

entity who is an industrial site owner . . . of an undivided interest in the industrial site located

upon any part of the Johnson Creek – 76th Industrial Park, shall by virtue of such ownership be a

member of the Association."  *Id*, p. 6 (Article III, § 1).  Each member has the "right of easement

and enjoyment in and to the Common Areas and the area designated as street area on and in land

owned by the Administration, in and to Common Areas and area designated as street area in the

Johnson Creek-76[th] Industrial Park . . . and such easement shall be appurtenant to and shall pass

with the title to every designated industrial site . . . ."  *Id*, p. 11 (Article VII).

      Stewart Title has submitted a letter dated October 16, 2008, from John E. LaVeille

("LaVeille"), Associate Counsel for PNWT, analyzing the easement issue.  *Id*, Ex. 19.  Although

not entirely clear, LaVeille apparently was explaining to the owners of lots 3607 and 3608 (also

in the industrial park) why their ability to utilize the easement across tax lots 601, 801, and 700

was "questionable." *Id*, p. 3. He explained that Brockamp & Jaeger conveyed lots 601, 801, and 700 to the Land Owners Association. *Id.* Because the Land Owners Association owns lots 601, 801, and 700, he concluded that "one could possibly construe" that all the lot owners in the industrial park have a right to cross these lots. *Id.* Since Emmert was a lot owner in the industrial park, he also was a member of the Land Owner Association with the right to cross those lots. This analysis is confirmed by the letter from Hall to Ellis dated March 27, 1996, interpreting the By-laws to mean that "[u]pon the purchase, it would seem to me that Mr. Emmert would acquire the voting interest . . . and the right to use the easement." *Id*, Ex. 5, p. 2. Similarly, Howell confirmed on April 25, 1996, that "all of this property is vested in the Johnson Creek-76[th] Industrial Park Land Owners Association and according to their By-laws[,] they have the authority to grant this easement (or the right to its use) to anybody." *Id*, Ex. 6, p. 1.

The 1996 Title Policy insures the Parcel IV easement as crossing lots 700, 601 and 801 which are owned by the Land Owners Association. *Id*, Ex. 9, p. 8; Ex. 12, p. 7; Ex. 19, p. 2. Emmert does not dispute that this portion of the Parcel IV easement provides a legal right of access to him as a lot owner and member of the Land Owners Association. The remaining portion of the Parcel IV easement crosses lots 3605, 3603 and 3601. *Id*, Ex. 9, p. 8. According to LaVeille, lot 3605 is also now owned by the Land Owners Association and, therefore, subject to the easement. *Id*, Ex. 19, p. 3. Lot 3603 is owned by Mr. Bliss whose deed states that it is subject to the easement. *Id*, p. 2. That leaves lot 3601. According to LaVeille, a 1973 deed conveyed a public easement across lot 3601, as well as across lots 3605 and 3603. *Id; see also* Ex. 4, p. 2. Thus, this remaining portion of the Parcel IV easement also provides a legal right of access to Emmert. Emmert has not submitted any evidence to contradict LaVeille's recitation of the various conveyances and resulting analysis.

11 - FINDINGS AND RECOMMENDATION

Emmert may very well not have had a legal right to use the access route to the Property that he actually used.  However, the evidence in the record reveals that he did have a legal right to the Parcel IV easement insured by the 1996 Title Policy.  Emmert may question the quality of the Parcel IV easement, but that does not entitle him to pursue a claim for damages against Stewart Title based on the lack of a legal right to that easement.

The problem faced by Emmert in 2009 was that Metro was unwilling to accept the Parcel IV easement as insured by the 1996 Title Policy.  As discussed next, the evidence is undisputed that Metro's unwillingness was due to a problem that the 1996 Title Policy excluded from coverage.

**III.    Exclusion from Coverage**

The 1996 Title Policy contains an exception to coverage for "Rights, duties, obligations and maintenance assessments in connection with the Johnson Creek-76[th] Industrial Park Land Owners Association and the use of the access road shown herein as Parcel IV."  Scott Decl., Ex. 9, p. 3 (exception # 14).  After receiving the Supplemental Preliminary Title Report containing this same exception (*id*, Ex. 15, p. 3), Metro expressed its concern to Emmert that "[t]he vesting deed of your predecessor in interest does not include an easement with the same description" and requested that the title company "document the origin of the access easement described in your vesting deed and as shown on the title report."  *Id*, Ex. 16, p. 1.  It is not clear from the record why Metro believed that the "vesting deed" differed from the description in the title report.  In any event, Metro then made it clear to Emmert on September 5, 2008, that it would not accept "this exception [# 14] unless an access easement appurtenant to the Property is granted by the Johnson Creek 76th Industrial Park Landowners Association."  *Id,* Ex. 17, p. 1

Based on Laveille's analysis of October 16, 2008, Metro may have shared his concern that any easement granted by the Land Owners association was "questionable." *Id,* Ex. 19, p. 3. LaVeille reached his conclusion because the By-laws of the Land Owners Association were not recorded, may never have been executed and, even if operative, may not bind the purchasers of lots in the industrial park who failed to receive notice of their existence. *Id.* As a result, LaVeille counseled other lot owners to clarify any easements to access their property.

Metro's concern was not related to the lack of a legal access easement to the Property; it simply desired a more specific access easement than existed. As Emmert admitted, Metro's concerns related to the access road and the rights, duties, and obligations of the Land Owners Association. Suppl. Scott Decl., Ex. 1, p. 4; Ex. 2. Thus, his loss in purchasing an easement falls squarely within the exception from coverage in the 1996 Title Policy. Accordingly, Stewart Title is not liable to Emmert.

## RECOMMENDATION

For the reasons set forth above, Stewart Title's Amended Motion for Summary Judgment (docket # 50) should be GRANTED, and a judgment should be entered dismissing this case with prejudice.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, June 04, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

13 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED May 17, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge